# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CA-02596-SCT

*HILL BROTHERS CONSTRUCTION &
ENGINEERING COMPANY, INC.*

*v.*

*MISSISSIPPI TRANSPORTATION COMMISSION*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 09/12/2003 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM R. PURDY |
| | JULIE SNEED MULLER |
| ATTORNEY FOR APPELLEE: | TIM HANCOCK |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 08/18/2005 |
| MOTION FOR REHEARING FILED: | 03/17/2005 |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     The motion for rehearing is denied.  This Court's previous opinion is withdrawn, and this opinion is substituted therefor.

¶2.     On April 20, 2001, Hill Brothers Construction & Engineering Company, Inc. ("Hill Brothers") filed suit against the Mississippi Transportation Commission ("MTC") in the Circuit Court of Hinds County, Mississippi.   In its complaint, Hill Brothers asserted that MTC's award of a construction contract to Angelo Iafrate Construction, LLC ("Iafrate") was

contrary to Mississippi law and wrongfully dispossessed Hill Brothers of the benefits of a contract which should have been awarded to it.

¶3.     On cross-motions for summary judgment, Circuit Judge W. Swan Yerger granted MTC's motion except as to Hill Brothers' standing to sue and dismissed Hill Brothers' complaint with prejudice.   Judge Yerger ruled that, as a matter of law, the MTC had acted within its discretion in awarding the subject contract to Iafrate.

¶4.     Hill Brothers appeals and raises the following issues:

> 1.   Did the lower court err in ruling that signing the wrong bid form on a competitively bid Mississippi public project was a "waivable technicality"?
>
> 2.   Did the lower court err in ruling that a bid deficiency was a "waivable technicality" when the public agency did not waive the deficiency but instead allowed it to be corrected after bids had been opened as a condition for award?
>
> 3.   Did the lower court err in ruling that a Mississippi public agency had discretion to waive a bid deficiency when, for at least 20 years, that agency had consistently rejected all bids having exactly the same deficiency?
>
> 4.  Did the lower court err in approving the award of a competitively bid public construction contract when the bidder became eligible for award only because the public agency allowed a correction of a bid deficiency seven hours after the bid deadline?
>
> 5.  Did the lower court err in considering the amount "saved" as justification for a public agency's acceptance of a defective bid?

¶5.     MTC did not file a cross-appeal, but raised "standing" in its appellate brief.   As this issue is not properly before the Court, we decline to address this issue on the merits.

¶6.     The very able and ingenious brief of the learned counsel for Hill Brothers does not point out any reversible error.   Therefore, the judgment of the Circuit Court of the First

2

Judicial District of Hinds County, Mississippi, dismissing Hill Brothers' complaint with prejudice is affirmed.

## FACTS

¶7.    The Mississippi Development Authority ("MDA") and the Mississippi Major Economic Impact Authority ("MMEIA") successfully competed with similar agencies of other states for several months during the year 2000.   MDA and MMEIA's efforts resulted in the decision of Nissan North America, Inc. ("Nissan") to locate a major automobile assembly plant on a site adjoining Interstate Highway 55 in Madison County, Mississippi.

¶8.    To secure the location of the plant, the MMEIA committed to build an interchange on Interstate 55, as well as other connector roads, so that the plant could be built and operated with access for suppliers and for access to transport the assembled automobiles to locations throughout the United States.

¶9.    To meet that commitment, the MTC and MMEIA authorized a memorandum of understanding[1] ("MOU") that was thereafter executed, which required the MTC to provide design functions for the construction, advertise for bids for the construction of the projects, oversee the construction and pay all costs necessary for the construction of the project.   *See* Miss. Code Ann. § 65-1-8 (2001).   The agreement provided that the advertising for the bids and the letting of contracts were subject to the concurrence of the MMEIA.   The agreement also required the MMEIA to reimburse the MTC for all costs, other than those for which federal funds may become available, associated with the construction.

---

[1] Neither the MDA or MMEIA had the sole authority to construct the interchange or provide the necessary access to the selected site location; therefore, this MOU was executed.

¶10. The MTC designed the plans and specifications for the interchange and connector roads, and the project was designated as Project No. ISP-0055-02(178)/103392, which commonly became known as the "Nissan Project" ("the project").

¶11. In January 2001, the MTC, acting through its subordinate agency, the Mississippi Department of Transportation ("MDOT"),[2] solicited competitively sealed bids for the project. The bids were to be received by and opened at 10:00 a.m. on January 23, 2001. The project was solicited on an expedited basis in order to provide highway infrastructure for construction as well as eventual operation of the manufacturing complex. MDOT sold the plans and specifications and other bid documents to all interested contractors. The bid documents contained bid sheets that listed the various work items to be performed and the materials to be used with a blank space beside each for the unit price or lump sum price and a total bid price for each item. Each contractor submitting a bid was required to place the unit price or lump sum bid price in the blank by each item and to add the separate prices to show a total bid price. The last page of the bid sheets provided a space for the total bid price and a statement to be signed by a bidder stating: "BIDDER ACKNOWLEDGES THAT HE/SHE HAS CHECKED ALL ITEMS IN THIS PROPOSAL FOR ACCURACY AND CERTIFIES THAT THE FIGURES SHOWN HEREIN CONSTITUTE THEIR OFFICIAL BID."

¶12. The "SECTION 905 PROPOSAL" is composed of Sheet No. 2-1 through 2-36, and two unnumbered pages for the bidder to sign stating that the contractor agrees to execute the

---

[2] The MTC has authority over the state's highways, which is implemented under MDOT's "control and supervision." Miss. Code Ann. § 65-1-47 (2001).

The MTC appoints MDOT's Executive Director who directs MDOT's activities. Miss. Code Ann. § 65-1-10 (2001).

The MTC is the entity subject to suit. Miss. Code Ann. § 65-1-5 (2001).

4

contract and that the contractor has included a certified check, cashier's check or bid bond, inter alia.

¶13.    On January 17, 2001, MDOT issued prospective bidders Addendum No. 1 ("Addendum" or "Addendum 1"), which made changes to the original solicitation for the project.[3]    The Addendum also included a computer disc containing a revised "SECTION 905 PROPOSAL" on which the bidders were to submit their lump sum and unit prices along with the total bid price.    This Addendum instructed bidders to remove the second unnumbered page of the "SECTION 905 PROPOSAL" in the original solicitation documents and replace it with the second unnumbered page of the  "SECTION 905 PROPOSAL" with Addendum.

¶14.    On January 23, 2001, at 10:00 a.m., the following three bids were opened, all of which were well under the State estimate of $53,915,773.76:

| | |
|---|---|
| (1) Iafrate | $34,634,028.67 |
| (2) Hill Brothers | $42,575,056.22 |
| (3) T.L. Wallace Co. | $43,050,703.00 |

¶15.    All potential bidders had been advised that the MTC would award the contract for the project on the day the bids were opened.  After being advised that Iafrate was the low bidder, the MTC publically accepted and awarded the bid to Iafrate and authorized the execution of a contract with Iafrate.

---

[3] It is not uncommon in a construction contract of this size for there to be numerous addenda.

¶16.    After the initial review of the bid, Billy Key[4] was advised that the bid of Iafrate contained the revised bid ("SECTION 905 PROPOSAL")[5] (Sheets No. 2-1 through 36) reflecting its itemized lump sum and unit prices and total bid as revised by the Addendum of January 17, 2001, and that the *bid*[6] (Sheet No. 2-36) was signed stating: "BIDDER ACKNOWLEDGES THAT HE/SHE HAS CHECKED ALL ITEMS IN THIS PROPOSAL FOR ACCURACY AND CERTIFIED THAT THE FIGURES SHOWN HEREIN CONSTITUTE THEIR OFFICIAL BID."  Iafrate also submitted the required bid bond for five percent (5%) of the amount bid, a signed second unnumbered page of the "SECTION 905 PROPOSAL" and an unsigned second unnumbered page of the "SECTION 905 PROPOSAL" with Addendum.

¶17.    Later that day, it was brought to the attention of Jim Kopf,[7] who was familiar with the plans and specifications for the project, that there was a potential irregularity in the bid of Iafrate.  Kopf determined that Iafrate's bid was in the amount of $34,630,028.67, that its bid was signed, that its bid contained all the items which were changed by the Addendum, that the bid reflected those changes as set forth in the Addendum and that the appropriate bid bond was signed and included with the bid proposal.

---

[4] Key is employed by the MTC as Contract Administration Engineer.

[5] The dissent incorrectly states that the "SECTION 905 PROPOSAL" was not submitted on all the forms.  The testimony by Keys is either ignored or misread by the dissent when it states that the "SECTION 905 PROPOSAL" was not submitted on all the forms provided.

[6] The dissent further incorrectly states that the "SECTION 905" signature sheets were entirely blank when in fact bid sheet No. 2-36 was signed by Iafrate, and bid sheet No. 2-36 included itemization and charges for all that was included in the addendum.

[7] Kopf is employed by the MTC as Chief Engineer.

6

¶18. Kopf and Steve McMahen[8] reviewed the bid proposal and found that they could clearly see that all items that were the subject of the bid proposal, as well as the changes set forth in the Addendum, were included in the bid submitted by Iafrate; further, they found that the individual bid sheets contained the costs for each item that was part of the project, including those that were part of the Addendum. Kopf, Keys and McMahen consulted with the attorneys representing the MTC, and they were informed that the irregularity was one that could be waived, but only the MTC had the authority to waive the irregularity.

¶19. Kopf had the responsibility to make a recommendation to the MTC. The only irregularity in the bid documents was the unsigned second unnumbered page of the "SECTION 905 PROPOSAL" with Addendum. Significantly, Kopf found a properly submitted bid in all other aspects. The bid was signed and contained all bid sheets, which included all the items required by the original bid documents and as required by the Addendum, including the required bid bond for five percent (5%) of the amount bid. Additionally, MMEIA was contacted because the award of the bid was subject to its concurrence and approval. MMEIA, with full knowledge of the irregularity, concurred in the award of the bid to Iafrate, as did the Federal Highway Commission.

¶20. On January 23, 2001, the same day on which the bids were opened and the MTC publically accepted and awarded the bid to Iafrate, MTC requested that Iafrate return to the offices of the MTC and sign the second unnumbered page of the "SECTION 905 PROPOSAL" with Addendum. At approximately 5:15 p.m., some seven hours after the deadline for

---

[8] McMahen is employed by the MTC as Assistant Chief Engineer. McMahen is responsible for various aspects of highway construction and the review of construction costs for the MTC.

submitting bids and after the bids were opened and the bid was publically awarded to Iafrate, an authorized representative from Iafrate returned to the offices of the MTC and signed the previously submitted unsigned second unnumbered page of the "SECTION 905 PROPOSAL" with Addendum.

¶21. During the afternoon of January 23, 2001, Hill Brothers began hearing industry rumors that something might have been amiss with Iafrate's bid. Accordingly, on the morning of January 24, 2001, Hill Brothers protested the award of the bid contending that Iafrate's bid was irregular because the second unnumbered page of the "SECTION 905 PROPOSAL" with Addendum was not signed, and further, that Iafrate had not met the contract commitment goal of 9% Disadvantaged Business Enterprise participation. The MTC reconvened that day and considered Hill Brothers' protest, heard the presentation made by Hill Brothers' attorney, and reaffirmed the award of the bid to Iafrate based on MTC's discretion to waive the irregularity. The MTC found that the failure of Iafrate to sign the acknowledgment of the receipt of the Addendum was an inadvertent omission, that the irregularity did not alter the bidding process, did not provide any bidder with an advantage or benefit, did not prejudice any other bidder, did not affect the price, quality or quantity of the bid and did not provide an opportunity for fraud or favoritism or affect the bidding process.

¶22. Hill Brothers did not take any action to prohibit or enjoin the award of the contract, and waited until two months later, after the work was in progress, before filing this action seeking damages in excess of $4,500,000.

## STANDARDS OF REVIEW

### I.

¶23.    The standard for reviewing the grant or the denial of summary judgment is the same standard employed by the trial court under Mississippi Rule of Civil Procedure 56(c).   This Court conducts a de novo review when reviewing a lower court's grant or denial of summary judgment.  *Saucier ex rel. Saucier v. Biloxi Reg'l Med. Ctr.*, 708 So. 2d 1351, 1354 (Miss. 1998).   "'This entails reviewing all evidentiary matters in the record: affidavits, depositions, admissions, interrogatories, etc.'"  *Id.* (quoting *Townsend v. Estate of Gilbert*, 616 So. 2d 333, 335 (Miss. 1993)) (citations omitted).   The trial court may grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Miss. R. Civ. P. 56(c).   A fact is material if it "tends to resolve any of the issues properly raised by the parties."  *Palmer v. Anderson Infirmary Benevolent Ass'n*, 656 So. 2d 790, 794 (Miss. 1995).

¶24.    Furthermore, "[a] motion for summary judgment should be overruled unless the trial court finds, beyond a reasonable doubt, that the plaintiff would be unable to prove any facts to support his claim."  *Id.* at 796.   The trial court is prohibited from trying the issues; "**it may only determine whether there are issues to be tried**."  *Id.* (citations omitted) (emphasis in original).   The evidence must be viewed in the light most favorable to the nonmoving party. *Id.* at 794.   If, in this view, the moving party is entitled to judgment as a matter of law, then summary judgment should be granted; otherwise, the motion for summary judgment should be denied. *Id.*

9

¶25. A case is ripe for summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c). A fact is material if it "tends to resolve any of the issues properly raised by the parties." *Palmer*, 656 So. 2d at 794. Here, no fact is in dispute.

¶26. MTC never disputed that it rejected known irregular bids. Since MTC never disputed the rejection of all known irregularities in the past and retained the discretion to waive the irregularity, it is clear that there existed no genuine issue of material fact in order to survive summary judgment.

## II.

¶27. The standard of review this Court employs when reviewing an administrative agency's decision is to determine whether the judgment "'(1) [w]as supported by substantial evidence; or (2) [w]as arbitrary or capricious; or (3) [w]as beyond the power of the lower authority to make; or (4) [v]iolated some statutory or constitutional right of the complaining party.'" *Landmark Structures, Inc. v. City Council*, 826 So. 2d 746, 749 (Miss. 2002) (quoting URCCC 5.03); *see Bd. of Law Enforcement Officers Standards & Training v. Butler*, 672 So. 2d 1196, 1199 (Miss. 1996); *J.H. Parker Constr. Co. v. Bd. of Aldermen of the City of Natchez*, 721 So. 2d 671, 677 (Miss. Ct. App. 1998). A rebuttable presumption exists in favor of the action of an administrative agency, and the burden of proof is on the party challenging an agency's action. *Pub. Employees' Ret. Sys. v. Marquez*, 774 So. 2d 421, 425 (Miss. 2000). "The existence within government of discrete areas of quasi-legislative, quasi-executive, quasi-judicial regulatory activity in need of expertise is the *raison d'etre* of the administrative

10

agency." ***McGowan v. Miss. State Oil & Gas Bd.***, 604 So. 2d 312, 323 (Miss. 1992). "Because of their expertise and the faith we vest in them, we limit our scope of judicial review." *Id. See also* **Grant Ctr. Hosp. of Miss., Inc. v. Health Group of Jackson, Miss., Inc.**, 528 So. 2d 804, 810 (Miss. 1988) ("The agency that works with a statute frequently, if not daily, that sees it in relation to other law in the field, necessarily develops a level of insight and expertise likely beyond our ken. When such agencies speak, courts listen.").

**DISCUSSION**

**I.**

¶28. The MTC is charged with the responsibility of developing a comprehensive, balanced transportation policy for this State and for designing and constructing the United States and State highways within the State of Mississippi. Miss. Code Ann. §§ 65-1-8 & 47 (2001).[9] To accomplish that purpose, the MTC designs the highways of this State, which are then constructed by private industry through a competitive bidding process as set forth in Miss. Code Ann. § 65-1-85 (2001).

¶29. The Legislature of this State mandates that the construction of highways is to be through the competitive bidding process as set forth in section 65-1-85 of the Mississippi Code Annotated.[10] That statute provides that all construction contracts "shall be made by the executive director, subject to the approval of the commission, only upon competitive bids after due advertisement. . . ." Miss. Code Ann. § 65-1-85. Other requirements are that requests for

---

[9] Given the fact that this case arose and was decided by the circuit court before the 2004 amendments to the Mississippi Code, we will refer to the statute as it read at that time, without the amendments.

[10] Amended by 2004 Miss. Laws ch. 542 (S.B. 2734).

11

proposals be advertised once a week for two weeks in the appropriate newspaper, that certain bond requirements are to be met, and the contract is awarded to the "lowest responsible bidder." *Id.* In addition to these requirements, section 65-1-85 provides:

> Advertisement for bids shall be in accordance with such rules and regulations, in addition to those herein provided, as may be adopted therefor by the commission, and the commission is authorized and empowered to make and promulgate such rules and regulations as it may deem proper, to provide and adopt standard specifications for road and bridge construction, and to amend such rules and regulations from time to time.

¶30.   Here, the following facts are undisputed: the manner in which the advertisements were made, the fact that Iafrate timely submitted a sealed bid, that Iafrate submitted the lowest of the three bids, that Iafrate's bid included the required and appropriate bond, that Iafrate's bid bond guaranteed that Iafrate would enter into a contract with the MTC for the amount of the bid, that Iafrate submitted the appropriate performance bond for the price of the contract, that Iafrate performed the work, and that Iafrate's bid included all work and materials. Hill Brothers alleges that the MTC violated its own rules by reading Iafrate's bid proposal and waived an alleged material irregularity by accepting the Iafrate bid, even though the second unnumbered page of the "SECTION 905 PROPOSAL" with Addendum was included, albeit, not signed.

¶31.   Such rules and regulations as authorized by section 65-1-85 were adopted by the MTC and are set forth in Sections 102.001 through 103.8 of the Mississippi Standard Specifications for Road and Bridge Construction, 1990 Edition, which is commonly known and referred to as the "Red Book."

¶32.   Section 102.07 states:

> **Irregular Proposals**.   Proposals will be considered irregular and _**may**_ be rejected for any of the following reasons:

12

(a) If the proposal is on a form other than that furnished by the Department, or if the form is altered or any part thereof is detached.

(b) If there are unauthorized additions, conditional or alternate bids, or irregularities of any kind which may tend to make the proposal incomplete, indefinite, or ambiguous as to its meaning.

(c) If the bidder adds any provisions preserving the right to accept or reject an award, or to enter into a contract pursuant to an award.

(d) If the proposal does not contain a unit price and extension for each pay item. (Except in the case of alternate pay items and when the unit of measurement is lump sum.)

(e) *If the proposal, Section 905, does not contain acknowledgment of receipt and addition to the proposal and contract documents of all addenda issued prior to opening of bids*.

(f) Failure to execute required affidavits, certificates, etc., and furnish proposal guaranty.

(Emphasis added).

¶33.    Section 103.01 states, in part: "The right is reserved to reject any or all proposals, to *waive any technicalities* or to advertise for new proposals.  (Emphasis added).

¶34.    The regulations of the MTC, which were part of the bid documents, do not mandate the rejection of any bid submitted in violation of Section 102.07.  The language of Section 102.07 clearly states that the violation of any such regulation "may" be considered by the MTC as a reason for rejecting a bid.  Therefore, since the regulation uses the permissive language "may" as opposed to the mandatory language "shall," whether to reject the bid is clearly within the discretion of the MTC.

¶35.    Hill Brothers claims that Iafrate's bid proposal did not meet the requirements of Section 102.07(e) because it did not contain a signed second unnumbered page of the "SECTION 905 PROPOSAL" with Addendum.  According to Hill Brothers, this made Iafrate's bid materially deficient.  However, Section 102.07 does not require the rejection of any bid that has any irregularity as defined therein.  We are not persuaded that the irregularity was

13

material. We find that the irregularity was minor, one which the MTC retained the discretion to waive, and accordingly not reversible error.

¶36. Hill Brothers' argument that the MDOT considered Iafrate's bid deficiency as "material" as stated in deposition testimony of various MDOT employees must fail for two distinct reasons. Number one is that the only entity that can make the decision is the MTC, not MDOT employees. Number two is that "material" is a legal term which is determined by the courts of this State and ultimately decided by this Court.

¶37. Hill Brothers claims that Iafrate's bid was "irregular." This is not contested. As the trial court noted, Section 102.07(e) grants the MTC the authority to reject a bid "[i]f the proposal, Section 905, does not contain acknowledgment of receipt *and* addition to the proposal and contract documents of all addenda issued prior to the opening of bids." (Emphasis added). The language of the regulation is conjunctive. For there to be an irregularity in a bid, there must have been a failure to contain an acknowledgment of receipt of the Addendum, *and* there must be a failure to include contract documents of addenda issued prior to the opening of bids. In its brief, Hill Brothers argues:

> The Section 905-Proposal signed by Iafrate and submitted with its bid was an unambiguous offer to perform only the originally [solicited] work. The bid signature sheet actually submitted by Iafrate with its bid [. . .] was a representation that Iafrate acknowledged receipt of and agreed to be bound by exactly zero addenda.

(First emphasis added).[11] The Section 905 Proposal, with the exception of unnumbered page two, and all other documents clearly contradict and disprove Hill Brothers's contention. The

---

[11] The dissent claims that "acknowledgment of receipt" is not an issue even though Hill Brothers states in its brief that Iafrate acknowledged receipt of nothing.

detailed bid and 5% bond given by Iafrate to the MTC also dispels this argument. Iafrate was bound because the MTC had a bid bond in the amount of five percent (5%) of $34,634,028.67 to ensure performance of the contract. If Iafrate failed to honor the bid, it would have forfeited approximately $1,731,701.43. The furnishing of the five percent (5%) bond clearly evidenced Iafrate's intent to perform. This intent was further confirmed by its detailed revised bid sheets, which reflected its lump sum and unit prices along with the total bid prices, and *covered every change submitted in Addendum 1.* Furthermore, Iafrate was bound because its authorized representative had signed the bid stating that it was "their official bid." By signing this bid stating that it was Iafrate's official bid, Iafrate agreed to execute the "Section 902" document.[12]

¶38. The bid sheets are not only an essential portion of the "SECTION 905 PROPOSAL," they are 36 of the 38 pages of the "SECTION 905 PROPOSAL" as evidenced at the top of each and every page of the bid sheets, including the signature page.

¶39. "Acknowledgment" is defined as: "1. A recognition of something as being factual. 2. An acceptance of responsibility. 3. *The act of making it known that one has received something.*" Black's Law Dictionary 19 (7th ed. 2000) (emphasis added). A review of the record reveals that Iafrate's bid proposal included the "SECTION 905 PROPOSAL" with Addendum. Therefore, Iafrate's bid unequivocally satisfies this Court (1) that Iafrate received the Addendum, (2) that its bid contained all the revised bid sheets sent out with the Addendum, and (3) that it accepted responsibility to be bound by the proposal with the addendum. Additionally, Iafrate's bid proposal contained the revised "SECTION 905 PROPOSAL" sheets, which included the additions or changes required by the Addendum and its unit price for all

---

[12] The contract between Iafrate and the MTC.

15

items or matters included in the Addendum were properly completed and stated the work to be performed, the cost for each item of work, and the total bid price. Iafrate included the original unnumbered page two of the "SECTION 905 PROPOSAL" executed, in addition to the unnumbered page two of the "SECTION 905 PROPOSAL" with Addendum, unexecuted, which without question establishes that the Addendum was received. The totality of the circumstances and all facts unequivocally reveal that Iafrate received and acknowledged the changes incorporated in the Addendum.

¶40. The argument Hill Brothers sets forth in regard to the unsigned second page of "SECTION 905 PROPOSAL" with Addendum was considered in *State ex rel. KNC, Inc. v. New Mexico Department of Finance and Administration, Property Control*, 704 P.2d 79 (N.M. Ct. App. 1985). In that case, the New Mexico Court of Appeals held that the failure of the low bidder to acknowledge the receipt of an addendum did not require the rejection of the bid. *Id.* at 83.

¶41. Competitive bidding procedures of federal agencies are governed by the Federal Acquisition Regulations System. Those regulations are instructional as they provide that there are some bid deficiencies or variations for which governmental agencies should either give the bidder the opportunity to cure or waive the deficiency.

Examples of minor informalities or irregularities include failure of a bidder to--

\* \* \*

(d) Acknowledge receipt of an amendment to an invitation for bids, but only if--
(1) *The bid received clearly indicates that the bidder received the amendment, such as where the amendment added another item to the invitation and the bidder submitted a bid on the item*; or

16

(2) The amendment involves only a matter of form or has either no effect or merely a negligible effect on price, quantity, quality, or delivery of the item bid upon. . . .

48 C.F.R. § 14.405 (1999) (emphasis added). One authority notes:

> Generally, formal defects not affecting the competitive character of a bid may be disregarded. Therefore, the mandatory provisions of a statute not being violate, a public board may waive compliance with its own requirements as to the form of bids or as to information to be supplied by the bidders. Defects in a bid may be waived where such waiver works no prejudice to the rights of the public and does not indicate favoritism or arbitrariness.

64 Am. Jur. 2d *Public Works and Contracts* § 61, at 693 (2001) (footnotes omitted).

¶42.     Hill Brothers relies on ***Smith v. Holmes County***, 242 Miss. 750, 137 So. 2d 195 (1962), for the proposition that an unsigned bid may not be accepted. Hill Brothers alleges that at the time Iafrate's bid was opened, "there was no signed bid from Iafrate for the revised project requirements on which a contract would be based" because the executed second page of the "SECTION 905 PROPOSAL" with Addendum was not submitted until seven hours after the time for receipt of bids. The holding in ***Smith*** that an unsigned bid may not be accepted continues to be the governing law of the state. Hill Brothers's reliance on ***Smith*** is without merit and not supported by the facts sub judice. The rule in ***Smith*** is inapplicable because there was clearly a signed bid[13] by Iafrate at the time the bids were opened.

¶43.     The irregularity did not alter the bidding process, did not provide any bidder with an advantage or benefit over any other bidder, did not prejudice the rights of any other bidder or the public, did not alter the price, quality or quantity of its bid, and the waiver of the irregularity

---

[13] Iafrate never amended its bid. The word "bid" is defined as: "[a] submitted price at which one will perform work or supply goods." Black's Law Dictionary 124 (7th ed. 2000).

17

did not provide an opportunity for fraud or favoritism or affect the integrity of the competitive bidding process. Therefore, the MTC retained the authority to waive the irregularity and award the bid to Iafrate. The minutes of the MTC constitute relevant and substantial evidence that the MTC considered this matter seriously, made the appropriate findings on record, and acted within its discretion in awarding the project to Iafrate. The trial court correctly noted that to have awarded the contract to Hill Brothers would have done a disservice to taxpayers of this State and would have also been contrary to the very purpose of competitive bidding.

¶44. Iafrate's bid clearly indicated that it had received the Addendum and submitted a bid which included all items included on the Addendum. As held in *New Mexico Department of Finance and Administration*, the failure of a low bidder to acknowledge receipt of an addendum does not require the rejection of that bid. We find that holding persuasive.

## II.

¶45. Hill Brothers next argues that the "amount of Iafrate's bid is totally irrelevant," and that the MTC and the trial court erred in considering the amount of money saved by not rejecting Iafrate's bid. We disagree.

¶46. Section 65-1-85 requires the MTC to award its highway construction projects to the "lowest responsible bidder." In *Landmark Structures*, the City of Meridian competitively solicited bids for the construction of a one million gallon elevated water tank. 826 So. 2d at 747. The project manual containing the bid specifications distributed to the prospective bidders included the instruction that the city reserved the right to reject any or all bids and to waive any informality. *Id.* The manual stated that the "concrete and framework requirements . . . shall be strictly enforced to ensure concrete of the highest practicable structural and

architectural standards." *Id.* Caldwell submitted the low bid of $1,261,000 and Landmark submitted a bid of $1,301,000. *Id.* at 748. After the city awarded the bid to Caldwell, Landmark challenged the award alleging that Caldwell's bid included the use of four feet forms instead of the six to twelve feet forms required by the manual, and that the tanks were composite tanks that had been constructed in 1996 and 1997 while the specifications required tanks that had been constructed five or more years prior to the bidding. *Id.* After reviewing the reasons for competitive bidding by public entities, this Court stated:

> [t]he purpose of provisions requiring that contracts with public authorities be let only after competitive bidding [is] to secure economy in the construction of public works and the expenditures of public funds for materials and supplies needed by public bodies; to protect the public from collusive contracts; to prevent favoritism, fraud, extravagance, and improvidence in the procurement of these things for the use of the state and its local self-governing subdivisions; and to promote actual, honest, and effective competition to the end that each proposal or bid received and considered for the construction of a public improvement, the supplying of materials for public use, etc., may be in competition with all other bids upon the same basis, *so that all such public contracts may be secured at the lowest cost to taxpayers*.

*Id.* at 749 (quoting *Hemphill Constr. Co. v. City of Laurel*, 760 So. 2d 720, 724 (Miss. 2000)) (emphasis added).

¶47. Affirming the award of the bid to Caldwell, this Court noted that the City of Meridian had specifically reserved the right to waive any formality, there was no evidence that Caldwell had received any economic advantage over other bidders, no danger was caused to the integrity of the construction by deviating from the specifications and there was no evidence of an economic disadvantage to Landmark. *Landmark Structures*, 826 So. 2d at 749-50.

¶48. The Oklahoma Supreme Court identified the purpose of competitive bidding for highways:

19

> It has a definite purpose; in our opinion, its sole purpose is to *obtain the best results at the lowest cost, the greatest value for the fewest dollars; in other words, it is a means for making the best possible bargain*, the means expressly adopted by the Legislature for obtaining such results.

*Flynn Constr. Co. v. Leininger* 125 Okla. 197, 257 P. 374, 378 (1927) (emphasis added).

¶49.    The rationale of **Landmark Structures** and **Leininger** provides a basis for allowing a waiver of an irregularity or technicality, particularly where to do otherwise, would defeat the very purpose of competitive bidding.  Here, if the MTC had rejected Iafrate's bid and awarded the project to Hill Brothers, it would have done so at an increased cost of $7,941,029.55 to the taxpayers of this State for exactly the same work.

### III.

¶50.    In the case sub judice, the MTC reserved the right to waive any technicality.  *See J.H. Parker Constr. Co.*, 721 So. 2d at 677 (noting that the regulation stated that a bid proposal "may" be rejected, and that Section 103.01 reserved the right to waive any irregularities).  Hill Brothers's allegation that this was not a minor irregularity is totally without merit.  Iafrate's failure to sign the second unnumbered page of the "SECTION 905 PROPOSAL" with Addendum did not alter or destroy the competitive bidding process, did not affect the price, quality or quantity of its bid, did not give it any economic advantage over other bidders, and there was no opportunity for fraud or favoritism, and the irregularity in the bid was one which the MTC had the authority and discretion to waive.  *Id.*  Additionally, MTC's waiver did not prejudice the rights of other bidder or the public.  *Id.*  The minutes of the MTC reflect that it considered this matter seriously, made the appropriate findings, and acted within its discretion in accepting Iafrate's bid.

20

¶51.     The dissent asserts that the MTC's decision was arbitrary and capricious.  However, this is the first **known** time that MTC was faced with these particular facts.  The irregularity was not discovered until after the bids were opened and publically awarded to Iafrate.

¶52.     This Court has stated:

> The terms "arbitrary" and "capricious" are open-textured and not susceptible of precise definition or mechanical application.  We find helpful meanings North Carolina has assigned in a not-dissimilar context:
>
> "Arbitrary" means fixed or done capriciously or at pleasure.  An act is arbitrary when it is done without adequately determining principle; not done according to reason or judgment, but depending upon the will alone,--absolute in power, tyrannical, despotic, non-rational,--implying either a lack of understanding of or a disregard for the fundamental nature of things.
>
> "Capricious" means freakish, fickle, or arbitrary.  An act is capricious when it is done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles. . . .

*McGowan*, 604 So. 2d at 322 (citations omitted).  *See also* ***Elec. Data Sys. Corp. v. Miss. Div. of Medicaid***, 853 So. 2d 1192, 1205 (Miss. 2003); *Marquez*, 774 So. 2d at 430 ("If an administrative agency's decision is not based on substantial evidence, it necessarily follows that the decision is arbitrary or capricious."); ***Miss. State Dep't of Health v. Natchez Cmty. Hosp.***, 743 So. 2d 973, 977 (Miss. 1999) (defining arbitrary as: "An administrative agency's decision is arbitrary when it is not done according to reason and judgment, but depending on will alone.") and (defining capricious as: "An action is capricious if done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and settled controlling principles.").

¶53. Of utmost importance is the fact that MTC retained the discretion to waive the irregularity, regardless of whether it exercised this discretion in the past. That discretion was not lost just because the MTC chose not to exercise it. Exercising this discretion for the first time in twenty years is not tantamount to an arbitrary or capricious act, either in fact or as defined in prior decisions of this Court.

¶54. The decision of the MTC was supported by substantial evidence, not arbitrary or capricious, not beyond its power to make, and did not violate Hill Brothers' statutory or constitutional rights.

## IV.

¶55. There is testimony that it has been the practice of the MTC to reject *known* irregular bids for the past 20 years. However, this does not violate the MTC regulations that the MTC retains authority to waive a minor irregularity.

¶56. Hill Brothers argues that the MTC abused its discretion to waive an irregularity by their prior conduct of rejecting all known irregular bids for the past twenty years. The MTC does not dispute its prior conduct, but clearly denies it abused its discretion.

¶57. It is of no consequence that the MTC rejected all known irregular bids because Hill Brothers has failed to prove that MTC's decision was arbitrary or capricious, was not supported by substantial evidence, was beyond the power of the MTC to make, or violated some statutory or constitutional right of Hill Brothers.

¶58. This was the first time for the MTC to address this particular situation. Initially, the MTC did not notice the minor irregularity when it publically accepted the bid. Therefore, it cannot be said that the irregularity was "known" at the time Iafrate's bid was accepted. We find

22

this to be distinguishable from the prior conduct of the MTC in rejecting all known bids for the past twenty years because it was not initially known. Consequently, it cannot be said that the MTC abused its discretion to waive the irregularity by their prior conduct of rejecting all known irregular bids for the past twenty years.

## V.

¶59. The MTC acted within its discretion in awarding the contract to Iafrate. Although Hill Brothers alleges that the MTC's award of the contract to Iafrate was beyond its powers rather than arbitrary or capricious, MTC did not exceed its decision making authority. *J.H. Parker Constr. Co.*, 721 So. 2d at 677. Hill Brothers' mere conclusionary allegations are not supported by the facts. Not only did MTC follow and apply the regulations in place and carefully examine the evidence, MTC sought the recommendations of its attorneys before it deemed the irregularity to be waivable. Additionally, MTC sought the recommendations of the MDOT staff and the advice of the Attorney General of the State of Mississippi. The MTC had also received the request of the MDA to waive the irregularity and confirm the award to Iafrate. The award also had the concurrence of the Federal Highway Administration and the MMEIA, the day before. The requests, recommendations and concurrences were all available to the MTC before it made its decision to waive the irregularity.

¶60. We find that the decision of the MTC was supported by substantial evidence, was not arbitrary or capricious, was not beyond its power to make, and was not in violation of any statutory or constitutional right of Hill Brothers. Therefore, this issue is devoid of any merit.

## CONCLUSION

¶61. Following a review of the pleadings, depositions, interrogatories, affidavits, and other documents in the record before this Court, and for the reasons stated above, there are no genuine issues as to any material fact. This Court finds that the learned trial judge did not err when he granted summary judgment in favor of the MTC. Therefore, the judgment of the Hinds County Circuit Court is affirmed.

¶62. **AFFIRMED.**

**SMITH, C.J., COBB, P.J., EASLEY AND GRAVES, JJ., CONCUR. WALLER, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CARLSON AND DICKINSON, JJ. DIAZ, J., NOT PARTICIPATING.**


**WALLER, PRESIDING JUSTICE, DISSENTING:**

¶63. I respectfully dissent from the majority opinion affirming the Hinds County Circuit Court's judgment. I would reverse and remand this case. In doing so, I think it is first critically important to revisit the facts surrounding the MTC's acceptance of Iafrate's bid.

¶64. The MTC solicited competitive bids for construction of the Nissan highway project. In its original solicitation, the MTC included a standard bid form (also known as a "Section 905"). This standard bid form is the bidder's essential assertion as to what work it agrees to do. Significantly, on page two (the bid signature sheet), there is a place on the bid sheet above the signature line to acknowledge any addenda that have been made part of the bid. The contract states that the total addenda acknowledged on the form "[m]ust agree with total addenda issued prior to opening of bids."

¶65. The MTC later issued Addendum Number One to prospective bidders, which included almost seventy new pages of text and thirty-six pages of revised construction plan sheets (i.e.

24

the Addendum contained completely different contractual terms than those originally advertised by the MTC). The Addendum (as well as several reminders sent by the MTC) specifically instructed bidders to remove the first signature sheet and substitute it with a new signature sheet containing the new contractual terms.

¶66. However, instead of signing the new signature sheet with its bid, Iafrate signed and submitted the old one. Although Iafrate *submitted* the new signature sheet, it left the sheet entirely blank and, in fact, it also left blank the spaces provided on the old, signed sheet for acknowledgment of any addenda made part of the bid (i.e. *nowhere on the new or old Section 905 signature sheets did Iafrate agree to the new terms of the contract*). Iafrate's bid otherwise appropriately contained the bid bond amount and the revised Section 905 bid sheets (which were signed and stated that the amount stated on the revised bid sheet was its "official bid").[14]

¶67. The MTC initially accepted Iafrate's bid without realizing Iafrate had not actually met the mandatory requirement of indicating assent to terms of the new Section 905 proposal. Billy W. Key, Contract Administration Engineer for the MDOT since 1979, was in charge of determining the completeness of the bid and did not notice the error when he first read the bids. However, after discovering the error, Key informed the MTC of the mistake and advised MTC's senior staff that Iafrate's bid was irregular and should be rejected. This was in line with Key's twenty-year practice of consistently refusing to even read a bid that contained any irregularities. The MTC recognized the conundrum with which it was faced, but decided, after

---

[14]Though the majority makes much of Iafrate's signature on the revised bid sheets (which are indeed a part of the Section 905 proposal) and posting of the bid bond, those additions were futile without the regulatorily required signature on the new signature sheet.

consulting with a number of sources, not to follow Key's advice. Instead, it summoned Iafrate to the MTC offices and requested that it sign the new Section 905 signature sheet (which specifically stated and required assent to the new terms), since otherwise (in the words of Jim Kopf, Chief Engineer for MDOT), "we would not [have] allowed the bid."

### A. Beyond the Power

¶68. On appeal to the Hinds County Circuit Court, the trial court could have granted the Hill Brothers' Partial Motion for Summary Judgment only if it found the MTC's order: (1) was not supported by substantial evidence; (2) was arbitrary or capricious; (3) was beyond the power of the administrative agency to make; or (4) violated some statutory or constitutional right of the complaining party. *Clancy's Lawn Care & Landscaping, Inc. v. Miss. State Bd. of Contractors*, 707 So. 2d 1080, 1082 (Miss. 1997).

¶69. Hill Brothers first argues that it was beyond the MTC's power, as a matter of law, to ignore the applicable regulations and accept Iafrate's non-conforming bid. Under Miss. Code Ann. § 65-1-85, the MTC is required to award a bid to the "lowest responsible bidder" in accordance with regulations adopted by the MTC. Pursuant to this statute, the MTC promulgated the Mississippi Standard Specifications for Road and Bridge Building ("the Red Book") which "contains a series of standard clauses and conditions that apply to all Commission contracts." *MTC v. Ronald Adams Contractor, Inc.*, 753 So. 2d 1077, 1080 (Miss. 2000). Only two Mississippi cases have interpreted the provisions of the Red Book. *Ronald Adams Contractor* dealt with the unrelated "no damage for delay" provisions of the Red Book and is inapplicable. The Mississippi Court of Appeals decided the case of *J.H. Parker Construction Co. v. Board of Aldermen of the City of Natchez*, 721 So. 2d 671, 677

26

(Miss. Ct. App. 1998), a case on which the majority's decision relies (although the majority only discusses the case in the context of the arbitrary and capricious standard). *J.H. Parker* is also inapplicable to the issue of whether the MTC's decision was beyond its power. In that case, the issue was whether, under Red Book provision 102.07 (one of the provisions pertinent to this case), it was a waiveable irregularity for the City of Natchez to overlook as a technicality a bidder's failure to file a list of individuals authorized to bind the company. *Id.* at 677. The issue in this case is whether the MTC violated a series of Red Book regulations when it awarded the Nissan project to Iafrate in spite of the fact that Iafrate's bid was not in compliance with the Red Book. Therefore, this is a case of first impression.

¶70. Here, in reviewing whether the MTC violated its own regulations, the majority solely finds that Sections 102.07 makes the decision to ignore an irregularity a discretionary one. Section 102.07 states, "Proposals will be considered irregular and may be rejected for any of the following reasons: . . . If the proposal, Section 905, does not contain acknowledgment of receipt[15] and addition to the proposal and contract documents of all addenda issued prior to opening of bids." Stated more succinctly (and using the language of Section 102.07), the Commission is afforded the discretion to waive a bidder's failure to attach "addition . . . of all addenda" "to the proposal and contract documents." The majority interprets this provision as giving the MTC the discretion to waive a company's failure to sign the crucial signature sheet. Though the waiveable "addition . . . of all addenda" "to the proposal and contract documents" may refer to some insignificant addenda which are not at issue before us today, several

---

[15]"Acknowledgment of receipt" is not at issue here.

mandatory regulations make abundantly clear that the "addenda" to which Section 102.07 refers do not include the signed, Section 905 signature sheet.

¶71.    For example:

> **Section 102.02 - Contents of the Proposal Forms. . . .** All papers bound with,  attached to, or designated for addition or substitution in the proposal are considered a part thereof and *must not* be detached or altered when the proposal is submitted.

(emphasis added).

¶72.    In this case, the MTC allowed Iafrate to alter the Section 905 proposal package seven hours after Iafrate submitted the proposal.

> **Section 102.06 - Preparation of Proposal.**    The bidder *shall* submit his proposal on the forms furnished by the Department

(emphasis added).

¶73.    Iafrate's Section 905 proposal was not submitted on all of the forms provided by the MTC.    Instead, Iafrate submitted the Section 905 signature sheets entirely blank with no reference to the massive changes to the contract (i.e. Iafrate did not "submit [its] proposal on the forms furnished by the Department.").[16]

_____

[16]The majority's insistence that the signature sheet was signed is not supported by the record.  The signature line on the revised Section 905 bid sheet *was* signed, but that did not meet the regulatory requirement that Iafrate fill out all of the forms provided by the MTC.  The Section 905 signature sheet which the MTC explicitly required Iafrate to insert and sign to acknowledge assent to the new terms *is entirely blank*.  Furthermore, even upon submitting the wrong signature sheet, Iafrate left blank the section which required that the addenda assented to "agree with total addenda issued prior to opening of bids."  Rebutting the majority's insistence that the revised Section 905 bid sheet constitutes the signature sheet is the fact that Jim Kopf, Chief Engineer, testified the MTC would have refused to award the bid without a signature on this specific sheet.

> **Section 102.09 - Delivery of Proposals.** . . . Proposals received after the time for opening of bids *will be* returned to the bidder unopened.

(emphasis added).

¶74.    Iafrate, under the direction of the MTC, finally submitted a complete Section 905 proposal seven hours after the time for opening of bids.

> **Section 102.10 - Withdrawal or Revision of Proposals.** A bidder may withdraw or revise a proposal after it has been deposited with the Department, provided the Director has received, in writing or by telegram, the request for such withdrawal or revision *prior to the time set for opening proposals.*

(emphasis added).

¶75.    The MTC allowed Iafrate to revise its proposal seven hours without a request for such and after the time set for opening proposals.

> **Section 103.02 - Award of Contract.** The award of contract, if it be awarded, *will be* made . . . to the lowest responsible . . . and qualified bidder whose proposal complies with all the requirements prescribed.

(emphasis added).

¶76.    Hill Brothers was unquestionably the lowest responsible and qualified bidder whose Section 905 proposal complied with all the requirements prescribed in the Red Book, yet the MTC awarded the bid to Iafrate.  No less than five times, the MTC admittedly violated its own regulations in allowing Iafrate to come in and amend its bid.

¶77.    In determining whether the trial court properly granted or denied a motion for summary judgment, we conduct a de novo review of the record.  ***Simpson v. Boyd***, 880 So. 2d 1047, 1050 (Miss. 2004).  A trial court may grant summary judgment "if the pleadings, depositions,

29

answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ***Id.*** On a motion for summary judgment, the trial court is forbidden to try the issues; "it may only determine whether there are issues to be tried." ***Id.*** The evidence must be viewed in the light most favorable to the non-moving party, in this case, the MTC. ***Id.***

¶78. The MTC readily admits it broke its own regulations and chose to allow Iafrate to alter its Section 905 proposal form. In fact, the MTC recognized the importance of this requirement when its representative testified it would not have even considered giving the bid to Iafrate unless the new Section 905 signature sheet was signed. Although our decisions do and should recognize the discretionary authority of an agency, we have never held that an agency has the power to violate its own mandatory regulations. Though the majority analyzes the MTC's discretion to waive minor "irregularities" under Section 102.07, we must also review the MTC's decision under Sections 102.02, 102.06, 102.09, 102.10 , and 103.02. These sections afforded no leeway for the MTC to call Iafrate into its offices to amend a Section 905 proposal that Iafrate was bound by the law to get right the first time. In violating these regulations, the MTC consequently violated the statute under which they were promulgated.

¶79. The majority's decision will otherwise provide a temporary victory for the MTC but will eventually work against it should it, in the future, attempt to hold a bidder to his word on a contract he claims he inadvertently did not sign.

### B. Arbitrary and Capricious

¶80. Furthermore, the trial court should have denied MTC's Motion for Summary Judgment on the issue of arbitrariness and capriciousness of the MTC's decision.

¶81. Billy W. Key, Contract Administration Engineer for the MDOT since 1979, testified that, until Iafrate's bid for the Nissan project, it was his unbroken practice for twenty years to reject any bid which contained any irregularity whatsoever.[17]

¶82. If that were not proof enough, the affidavits of Dwayne H. Boyd and John F. Hill, Jr. Boyd, president of APAC-Mississippi, Inc., a Delaware corporation, buttress a finding of arbitrariness and capriciousness. Boyd testified that he has attended approximately 100 bid openings in the last sixteen years. During that time, he states has "personally witnessed the same practice and policy be applied by MDOT with regard to other bids which have failed to acknowledge an addendum. *The only exception* to this consistent practice and policy of MDOT was for the bid submitted by [Iafrate][.]" (emphasis added). Hill, president and chief executive officer of Hill Brothers, testifies that he has attended more than 200 bid openings in the last twenty-two years. He states in his affidavit

> I personally know of dozens of bids which have been rejected by
> MDOT . . . as irregular, including at least one past occasion in
> which a low bid submitted by Hill [Brothers] on another project
> was declared irregular, was not read, and was not considered for
> award. *I am not aware of any instance, except this one* involving
> Iafrate, in which MDOT has waived a bid irregularity and the
> commission has awarded a contract to a bidder who submitted an
> irregular bid.

(emphasis added).

---

[17]Unlike the regulations, Key does not appear to semantically acknowledge the difference between an irregularity and noncompliance which mandatorily renders a bid unacceptable.

¶83. On appeal to the Hinds County Circuit Court, the trial court should have denied Motion for Summary Judgment because MTC's decision to award the bond to Iafrate: (1) was not supported by substantial evidence; (2) was arbitrary or capricious; (3) was beyond the power of the administrative agency to make; or (4) violated some statutory or constitutional right of the complaining party. *Clancy's Lawn Care & Landscaping, Inc.*, 707 So. 2d at 1082.

¶84. We have previously held that although public boards are vested with "sound discretion in making a determination as to who is the 'lowest and best bidder,'" such a determination cannot be made arbitrarily and capriciously. *Walley v. Bd. of Trustees of Richton Mun. Separate Sch. Dist.* 241 So. 2d 644, 646 (Miss. 1970) (citing 43 Am. Jur. *Public Works & Contracts*, § 44 (1942)). In *Mississippi State Dept. of Health v. Southwest Mississippi Regional Medical Center*, 580 So. 2d 1238, 1240 (Miss. 1991), we held that a decision is arbitrary "when it is done without adequately determining principle[,] . . . depending upon the will alone," and capricious when done in a way that implies "either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles."

¶85. The majority opinion cites to the case of *J.H. Parker Construction Co. v. Board of Aldermen of the City of Natchez*, 721 So. 2d 671, 677 (Miss. Ct. App. 1998), in support of its holding that summary judgment in favor of the MTC regarding the "arbitrary and capricious" standard is appropriate as a matter of law. However, *J.H. Parker Construction* is wholly inapplicable to the issue here of whether the MTC's decision to violate its own regulations was arbitrary and capricious. The issue in that case was whether, under Red Book provision 102.07, it was arbitrary and capricious for the City of Natchez to overlook as a technicality a bidder's

32

failure to file a list of individuals authorized to bind the company. *Id.* at 677. This case deals with the MTC's decision to violate Sections 102.02, 102.06, 102.09, 102.10 , and 103.02 and allow Iafrate to sign the Section 905 signature sheet  seven hours after the deadline and contrary to twenty years of consistently refusing to even read a bid not in compliance with the regulations. Therefore, this is an issue of first impression as well. We have reliable jurisprudence on which to rely in dealing with this issue for the first time.

¶86. The United States Supreme Court has held (in the context of construing the analogous "arbitrary and capricious" standard as found in the federal Administrative Procedures Act), that although

> the agency's discretion is unfettered at the outset, if it announces and follows - by rule or by settled course of adjudication - a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as "arbitrary, capricious, [or] an abuse of discretion."

*INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32, 117 S. Ct. 350, 353, 136 L. Ed. 2d 288 (U.S. 1996). In light of the fact that I can find no Mississippi law which directly speaks to this issue, I find *Girard v. City of Glens Falls*, 577 N.Y.S.2d 496 (N.Y. App. Div. 1991) instructive. In that case, the court dealt with an analogous fact scenario in which the Board of Public Safety terminated a firefighter after he joined a local Democratic committee and then ran for political office. As authority for its decision, the Board cited a regulation absolutely prohibiting members of the fire department from such political involvement. *Id.* In overturning the termination, the court stated that even if the Board's decision "was supported by substantial evidence, this court can annul such a determination as arbitrary and capricious if it departs

33

from prior administrative policy." *Id.* The court found that "petitioner was apparently the first and only person to ever be prosecuted under that provision" in spite of the fact that other firefighters had run and held public office in the past. *Id.* The court then held that "[w]henever an administrative body fails to conform to prior procedure without adequate explanation for the change, its determination must be set aside as arbitrary and capricious." *Id.* Analogous to the Board's decision in *Girard* to discriminately prosecute under a regulation for the first time, Hill Brothers alleges that the MTC discriminately decided *not* to "prosecute" under a regulation for the first time when it made the unprecedented decision to overlook the irregularities in Iafrate's bid.

¶87. In light of the fact that we have no jurisprudence speaking to this issue, I would follow the sound authority of the United States Supreme Court as well as other jurisdictions. *See* 2 Am. Jur. 2d *Administrative Law* § 499, at 421 & n.7 (2004)(citing *Girard* and stating "failure of an agency to abide by its rules is per se arbitrary and capricious as is the failure of an administrative body to conform to prior procedure without adequate explanation for the change."(footnotes omitted)). Although the MTC has offered an explanation for its acceptance of this particular bid, it has not offered an adequate explanation for its rejection of identically irregular bids in the past.

¶88. Not only did the MTC fail to abide by its rules (which is per se arbitrary and capricious), the MTC admittedly violated its own consistent, zero tolerance policy for contractual discrepancies, major or minor (which also is per se arbitrary and capricious). *Id*. This "irrational departure from [its] policy," *Yueh-Shaio Yang*, 519 U.S. at 32, is a classic example of an arbitrary and capricious act by an agency.

34

¶89. For these reasons, I would reverse the circuit court's judgment and remand this case to the circuit court for further proceedings.

**CARLSON AND DICKINSON, JJ., JOIN THIS OPINION.**